IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

| | | |
|---|---|---|
| IN RE: | **DANIEL L. JOHNSON and** | **CASE NO. 3:10-bk-19119** |
| | **SUSAN D. JOHNSON, Debtors** | **Chapter 13** |
| IN RE: | **TAMMY R. PEEKS, Debtor** | **CASE NO. 3:11-bk-10602** |
| | | **Chapter 13** |
| IN RE: | **TRACY L. ESTES, Debtor** | **CASE NO. 3:10-bk-16541** |
| | | **Chapter 13** |

<u>MEMORANDUM OPINION</u>
<u>AND</u>
<u>ORDER OVERRULING OBJECTIONS TO CONFIRMATION</u>

In a consolidated hearing on July 14, 2011, the Court heard the *Objection to Confirmation of Plan* filed by Chase Home Finance, L.L.C. ("**Chase**") in the case of Daniel and Susan Johnson, Case No. 3:10-bk-19119 (the "**Johnson Objection to Confirmation**"); the *Objection to Confirmation of Plan* filed by J.P. Morgan Chase Bank, N.A. ("**J.P. Morgan**") in the case of Tammy Renae Peeks, Case No. 3:11-bk-10602 (the "**Peeks Objection to Confirmation**"); and the *Objection to Confirmation of Plan* filed by Chase in the case of Tracy L. Estes, Case No. 3:10-bk-16541 (the "**Estes Objection to Confirmation**") (collectively the "**Objections to Confirmation**"). J.P. Morgan appeared through its counsel, Kimberly Burnette of Wilson & Associates, P.L.L.C.[1] The Debtors in

---

[1] Although the objections to confirmation were filed by two separate creditors, J.P. Morgan and Chase, as of the date of the hearing all of the claims at issue in this matter had been transferred to J.P. Morgan.

all three cases were represented at the hearing by Joel Hargis of Crawley & DeLoache, P.L.L.C.  Kathy A. Cruz of The Cruz Law Firm, P.L.L.C, also appeared as co-counsel for the Debtor, Tracy L. Estes.  At the outset of the hearing, the parties agreed that the facts of the cases were not in dispute, and that the same underlying issue of law was present in each case. For that reason, the hearings were consolidated.  The Court accepted evidence and heard the arguments of counsel.[2]  At the close of the hearing, the Court took the matter under advisement.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).  This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule of Procedure 7052.  To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. As explained herein, the Court overrules the Objections to Confirmation.

## FACTS

The parties stipulated that at the time of the foreclosure proceedings at issue in these cases, neither Chase nor J.P. Morgan was "authorized to do business" in the state of Arkansas as required by §18-50-117 of the Arkansas Statutory Foreclosure Act of 1987, Ark. Code

---

[2] The Court also takes judicial notice of all filings and records in these cases, including the proofs of claim.  *See* Fed. R. Evid. 201; *In re Henderson*, 197 B.R. 147, 156 (Bankr. N.D. Ala. 1996) ("The court may take judicial notice of its own orders and of records in a case before the court, and of documents filed in another court.") (citations omitted); *see also In re Penny*, 243 B.R. 720, 723 n.2 (Bankr. W.D. Ark. 2000).

2

Ann. §§ 18-50-101, *et seq.* (the "**Statutory Foreclosure Act**"). Additionally, the Court finds the following to be the facts of each case:

### *The Johnson Case*

Chase initiated non-judicial foreclosure proceedings, through Arkansas' Statutory Foreclosure Act, against a property owned by Daniel and Susan Johnson. On December 20, 2010, the Johnsons filed a Chapter 13 bankruptcy bringing that non-judicial foreclosure to a halt. In their bankruptcy case, the Johnsons filed a Chapter 13 plan listing Chase as a long-term secured creditor that was owed an arrearage of $7,485. On March 2, 2011, Chase filed the Johnson Objection to Confirmation claiming that the correct arrearage amount was $14,072.81. Chase filed a proof of claim in the case (the "**Johnson Proof of Claim**") claiming a secured debt of $187,468.21, which included the $14,072.81 arrearage, and explained that $1,380 of the arrearage was for foreclosure fees and costs. On July 4, 2011, Chase transferred the Johnson Proof of Claim to J.P. Morgan.

### *The Peeks Case*

J.P. Morgan initiated a non-judicial foreclosure proceeding, through Arkansas' Statutory Foreclosure Act, against property owned by Tammy Renae Peeks. To initiate the foreclosure process, J.P. Morgan granted Wilson & Associates, P.L.L.C. ("**Wilson & Associates**") a limited power of attorney authorizing Wilson & Associates to conduct the foreclosure.[3] On January 31, 2011, Ms. Peeks filed a Chapter 13 bankruptcy bringing the

---

[3] J.P. Morgan only presented the limited power of attorney filed in the property records for the Peeks case, but J.P. Morgan's counsel represented to the Court that a similar limited

3

non-judicial foreclosure to a halt.  On February 10, 2011, Ms. Peeks filed a proposed Chapter 13 plan that listed J.P. Morgan as a long-term secured creditor that was owed an arrearage of $7,500.  On March 21, 2011, J.P. Morgan filed the Peeks Objection to Confirmation asserting that the correct arrearage amount was $10,089.19.  J.P. Morgan filed a proof of claim in the Peeks case on July 13, 2011 (the **"Peeks Proof of Claim"**) claiming a secured debt of $133,172.09, which included an arrearage of $9,516.72, and explained that $2,400.02 of the arrearage was for foreclosure fees and costs.

## *The Estes Case*

Chase initiated non-judicial foreclosure proceedings, through Arkansas' Statutory Foreclosure Act, against a property owned by Tracy L. Estes.  On September 8, 2010, Ms. Estes filed a voluntary petition for bankruptcy under Chapter 13, bringing that non-judicial foreclosure to a halt.  On September 21, 2010, Ms. Estes filed a proposed Chapter 13 plan listing Chase as a long-term secured creditor that was owed an arrearage of $8,000.  Chase filed the Estes Objection to Confirmation on October 20, 2010, asserting that the correct arrearage amount was $10,537.36.  Chase filed a proof of claim in the Estes case on October 28, 2010 (the **"Estes Proof of Claim"**), claiming a secured debt of $37,041.96, which included an arrearage of $10,509.36, and explained that $2,706.56 of the arrearage was for to foreclosure fees and costs.  On May 25, 2011, Chase filed an amended proof of claim adjusting the arrearage from $10,509.36 to $10,502.22.  On July 14, 2011, Chase transferred

_____

power of attorney was granted and recorded in the property records for each of the three cases.

4

the Estes Proof of Claim to J.P. Morgan.

## DISCUSSION

The question before the Court is whether the Debtors owe J.P. Morgan the foreclosure fees and costs listed on its proofs of claims.  The Bankruptcy Code allows a debtor in a Chapter 13 bankruptcy case to cure a default on a debt for its home mortgage through the plan.  11 U.S.C. §§ 1322(b)(3), (5).  In order for that plan to be confirmed, a debtor must pay the default arrearage amount in full.  The amount owed in order to cure a default is "determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1322(e).  This determination poses two separate inquires: first, what fees and costs are allowed by the agreement between the parties, and second, what fees and costs are allowed by the applicable law.  *See In re Bumgarner*, 225 B.R. 327, 328 (Bankr. D.S.C. 1998).

In these cases, there is no dispute that the foreclosure fees and costs are owed under the parties' agreements because the instrument used to create each debt gives J.P. Morgan "the right to be paid back by me for all of its costs and expenses in enforcing this Note . . . ."  The only question in each of these three cases is whether the foreclosure fees and costs are allowed by the controlling law.  The controlling law is Arkansas' Statutory Foreclosure Act (*i.e.*, Arkansas' non-judicial foreclosure procedure), and the issue is whether J.P. Morgan was qualified to use Arkansas' non-judicial foreclosure procedure when it initiated the foreclosure proceedings against these Debtors.

The Debtors argue that J.P. Morgan was not qualified to use the non-judicial

5

foreclosure process because § 18-50-117 of the Statutory Foreclosure Act requires an entity to be authorized to do business in Arkansas, and that J.P. Morgan was not in compliance with that requirement.

J.P. Morgan stipulated that it was not authorized to do business as is required Ark. Code Ann. § 18-50-117. Nonetheless, it maintains that it was qualified to use Arkansas' non-judicial foreclosure process. J.P. Morgan makes three arguments in support of its position. First, J.P. Morgan argues that its compliance with § 18-50-102 of the Statutory Foreclosure Act enabled it to legitimately employ the non-judicial foreclosure process without being authorized to do business in the state as required by Ark. Code Ann. § 18-50-117. Second, J.P. Morgan argues that the authorized-to-do-business requirement is superseded by a conflicting provision in Arkansas' Wingo Act, Ark. Code Ann. § 4-27-1501, and finally, that it is preempted by federal law through the provisions of the National Banking Act.

For the reasons discussed below, the Court finds that J.P. Morgan was not qualified to use the Arkansas non-judicial foreclosure process when it initiated the foreclosures against these Debtors. J.P. Morgan failed to comply with the authorized-to-do-business requirement of Ark. Code Ann. § 18-50-117, and nothing in Ark. Code Ann. § 18-50-102, the Wingo Act, or the National Banking Act allowed it to conduct those proceedings without meeting that requirement. Absent compliance with Ark. Code Ann. § 18-50-117, J.P. Morgan's avenue for foreclosing on these properties was that of judicial foreclosure through the courts, not through Arkansas' non-judicial foreclosure process. As a result, the foreclosure fees and costs incurred by Chase and J.P. Morgan are not owed by the Debtors, and need not be

6

included in the Debtors' repayment plans in order for those plans to be confirmed.

Finally, both parties request their attorney fees for pursuing or defending these matters. The Court finds that an award of attorney fees to the Debtors is warranted.

### The Statutory Foreclosure Act

In 1987, the Arkansas legislature enacted the Statutory Foreclosure Act, which authorized the use of non-judicial foreclosure proceedings as an alternative to judicial foreclosure proceedings. Ark. Code Ann. §§ 18-50-101, *et seq. See also Union Nat'l Bank v. Nichols,* 305 Ark. 274, 278, 807 S.W.2d 36, 38 (1991) ("The procedure is designed to be effectuated without resorting to the state's court system . . . ."). These statutory provisions must be strictly construed. *See Robbins v. M.E.R.S.,* 2006 WL 3507464, at *1 (Ark. Ct. App. 2006) ("It is also true that the Arkansas Statutory Foreclosure Act, being in derogation of common law, must be strictly construed.").[4]

The parties' arguments are based on two provisions of the Statutory Foreclosure Act; Ark. Code Ann. § 18-50-117 and Ark. Code Ann. § 18-50-102. Each of these two provisions places a restriction on who can use Arkansas' non-judicial foreclosure process. The first provision, Ark. Code Ann. § 18-50-117, requires a creditor to be authorized to do business in Arkansas before employing the state's non-judicial foreclosure process. Ark. Code Ann.

---

[4] The Court notes that counsel for the Debtors argued that a determination that the statute had been violated would make any sale under the Statutory Foreclosure Act void *ab initio.* No property sales actually resulted from the foreclosure proceedings in these cases. The sole dispute in these cases is whether the foreclosure fees and costs incurred through use of Arkansas' non-judicial foreclosure process are owed.

7

§ 18-50-117 ("No person, firm, company, association, fiduciary, or partnership, either domestic or foreign shall avail themselves of the procedures under this chapter unless **authorized to do business** in this state.") (emphasis added).[5]  The second provision, Ark. Code Ann. § 18-50-102, limits who can be a party to a non-judicial foreclosure proceeding to three categories of persons or entities: (1) trustees or attorneys-in-fact, (2) financial institutions, and (3) Arkansas state agencies.  *See* Ark. Code Ann. § 18-50-102.[6]  Further, this provision requires that in order to qualify, a "trustee or attorney-in-fact" must be a licensed member of the Arkansas bar, or a law firm who employs a licensed member of the Arkansas bar.  Ark. Code Ann. § 18-50-102(a)(1).

The Debtors argued that J.P. Morgan was not qualified to use the non-judicial foreclosure process because § 18-50-117 of the Statutory Foreclosure Act requires an entity to be authorized to do business in Arkansas, and J.P. Morgan stipulated that it was not in compliance with that provision.  J.P. Morgan argued that it was not required to comply with

---

[5]  The Court notes that no explanation is provided by the statute regarding what action is required in order to be authorized to do business under Ark. Code Ann. § 18-50-117. Following a review of other provisions within the Arkansas Code, it appears that this requirement generally demands that a party obtain a certificate of authority from the secretary of state.  *See* Ark. Code Ann. § 23-48-1003 ("A certificate of authority authorizes the out-of-state bank to which it is issued to transact business in the state . . . ."); Ark. Code Ann. § 4-27-1501 ("A foreign corporation may not transact business in this state until it obtains a certificate of authority from the Secretary of State.").  However, no such determination is necessary in these cases because J.P. Morgan stipulated that it was not so authorized.

[6]  J.P. Morgan did not argue that it met the requirements of the Statutory Foreclosure Act because it was a "financial institution."  Nonetheless, the Court notes that even if J.P. Morgan qualified as a financial institution under Ark. Code Ann. § 102, it would still be required to comply with the fundamental statutory requirement of Ark. Code Ann. § 18-50-117 for the same reasons discussed herein with regard to its use of an attorney-in-fact.

Ark. Code Ann. § 18-50-117 because it authorized Wilson & Associates to conduct the foreclosures as its attorney-in-fact, pursuant to Ark. Code Ann. § 18-50-102(a)(1). This argument extends in two directions.[7]

Specifically, one extension of J.P. Morgan's argument is that when the attorney-in-fact category of § 18-50-102 is used, the authorized-to-do-business requirement of § 18-50-117 does not apply. The Court finds no support for this argument. The language of Ark. Code Ann. § 18-50-117 is broad, specifically stating that it is applicable to every "person, firm, company, association, fiduciary, or partnership, either domestic or foreign . . . ." An emergency clause recorded in the sessions laws of Ark. Code Ann. § 18-50-117 explains the reason that the provision was enacted:

> It is found and determined by the General Assembly of the State of Arkansas that foreign entities not authorized to do business in the State of Arkansas are availing themselves to [sic] the provisions of the Statutory Foreclosure Act of 1987; that often times it is to the detriment of Arkansas citizens; and that this act is immediately necessary because these entities should be authorized to do business in the State of Arkansas before being able to use the Statutory Foreclosure Act of 1987.

2003 Ark. Acts 1303, § 3, effective Apr. 14, 2003. The broad language of this provision, and the clear concerns set out in the legislative history, indicate that Ark. Code Ann. § 18-50-117 was meant to apply without regard to which category of person or entity is conducting the

---

[7] J.P. Morgan did not provide the Court with the analytical extensions needed to support its argument. As a result, the Court has analyzed all possible extensions of that argument, which include (1) that because J.P. Morgan authorized an attorney-in-fact to conduct the foreclosure, Ark. Code Ann. § 18-50-117 did not apply, or (2) that because J.P. Morgan authorized Wilson & Associates to conduct the foreclosure it satisfied the requirement of Ark. Code Ann. § 18-50-117.

foreclosure under Ark. Code Ann. § 18-50-102.

Further, the Court finds nothing in the language of Ark. Code Ann. § 18-50-102 to indicate that it eliminates the need to comply with the authorized-to-do-business requirement of Ark. Code Ann. § 18-50-117, or that the attorney-in-fact party should be treated in any way different from the other categories of persons or entities allowed to conduct a non-judicial foreclosure proceeding. Further, the most recent enactment of Ark. Code Ann. § 18-50-102, now in effect, places several additional requirements on an attorney-in-fact before he can qualify as a party to a non-judicial foreclosure proceeding. In addition to the requirement that the attorney-in-fact be licensed in Arkansas (which was the law at the time of these foreclosure proceedings), an attorney-in-fact must now also have an office located in Arkansas, be accessible during business hours, and be able to accept funds as payment on the subject mortgage. *See* 2011 Ark. Acts 901, § 2, effective July 27, 2011. These recent additional restrictions to the attorney-in-fact qualification provide further evidence of the Arkansas legislature's intent to limit access to the Statutory Foreclosure Act, not to further broaden access to that process as J.P. Morgan's argument would necessarily require.

A second extension of J.P. Morgan's argument is that, even if Ark. Code Ann. § 18-50-117 applies, J.P. Morgan satisfied the authorized-to-do-business requirement because its attorney-in-fact, Wilson & Associates, satisfied that requirement. This argument also fails. The procedures for appointing an attorney-in-fact to conduct the foreclosure are self-contained within the § 18-50-102 of the Statutory Foreclosure Act. This appointment is accomplished through the use of a power of attorney. Ark. Code Ann. § 18-50-102(e) ("The

10

appointment of an attorney-in-fact by a mortgagee shall be made by a duly executed, acknowledged, and recorded power of attorney . . . .").  That power of attorney provides the attorney-in-fact only with those powers held by the appointing mortgagee.  Ark. Code Ann. 18-50-102(d) ("A mortgagee may delegate **his or her powers and duties** under this chapter to an attorney-in-fact, whose acts shall be done **in the name of and on behalf of** the mortgagee.") (emphasis added).

J.P. Morgan appointed Wilson & Associates as its attorney-in-fact through a limited power of attorney.  Wilson & Associates did not initiate the foreclosure proceedings on its own behalf, but initiated those proceedings "in the name of and on behalf of" J.P. Morgan. It is J.P. Morgan's compliance with the authorized-to-do-business requirement that is relevant, not that of Wilson & Associates.  Thus, the Court finds that J.P. Morgan's compliance with Ark. Code Ann. § 18-50-102 by electing to use an attorney-in-fact did not, by substitute, afford it compliance with the authorized-to-do-business requirement in Ark. Code Ann. § 18-50-117.

Therefore, J.P. Morgan has failed to show that its compliance with § 18-50-102 of the Statutory Foreclosure Act enabled it to legitimately employ the non-judicial foreclosure process without being authorized to do business in the state.

### *The Wingo Act*

J.P. Morgan argues that a conflict between the Wingo Act (Ark. Code Ann. §§ 4-27-1501, *et seq.*), and the Statutory Foreclosure Act (Ark. Code Ann. §§ 18-50-101, *et. seq.*), allows J.P. Morgan to conduct non-judicial foreclosures without complying with the

11

authorized-to-do-business requirement found in § 18-50-117 of the Statutory Foreclosure Act.

The Wingo Act is a sub-provision of the Arkansas Business Corporation Act, found at Ark. Code Ann. §§ 4-27-101, *et seq*. The Wingo Act states that "[a] foreign corporation may not transact business in this state until it obtains a certificate of authority from the Secretary of State." Ark. Code Ann. § 4-27-1501(a). However, the Wingo Act also contains a non-exhaustive list of actions that do not constitute transacting business. Ark. Code Ann. § 4-27-1501(b). This list includes, among other things, the acts of "[m]aintaining, defending, or settling any proceeding[,]" and "[s]ecuring or collecting debts or enforcing mortgages and security interests in property securing the debts[.]" Ark. Code Ann. §§ 4-27-1501(b)(1), (8).

J.P. Morgan asserts that a conflict exists between the Wingo Act and the Statutory Foreclosure Act because the Wingo Act does not require a creditor to be authorized to do business in order to collect on its debt; the Statutory Foreclosure Act does. J.P. Morgan argues that the Wingo Act controls this conflict, and thus, the authorized-to-do-business requirement of the Statutory Foreclosure Act does not apply.

It is a well-settled principle of construction that where two statutes conflict, the more specific statutory provision controls. *See Ozark Gas Pipeline Corp. v. Arkansas Public Service Comm'n*, 342 Ark. 591, 602, 29 S.W.3d 730, 736 (2000) ("The rule is well settled that a general statute must yield when there is a specific statute involving the particular matter."). The exclusions afforded in the Wingo Act address the broad category of "[s]ecuring or collecting debts or enforcing mortgages and security interests . . . ." Ark. Code

12

Ann. § 18-27-1501(b)(8).  The Statutory Foreclosure Act, on the other hand, deals with a specific type of collection activity – foreclosure – and an even more specific type of foreclosure – non-judicial foreclosure.  Given the greater specificity of Ark. Code Ann. § 18-50-117, the Court finds that the Statutory Foreclosure Act provision carves out the specific statutory procedure of non-judicial foreclosure from the broad category of collecting debts, and as a result, controls any conflict between the two provisions.

Further, J.P. Morgan's argument ignores the other provisions of the Wingo Act.  The provision immediately following the exclusionary provision states that the consequence of transacting business without a certificate of authority is: (1) the foreign corporation is prohibited from maintaining a cause of action in the state courts, and (2) the foreign corporation must pay a monetary penalty.  Ark. Code Ann. §§ 4-27-1502(a), (d)(1)(A).[8]  As such, the exclusions allowed by § 4-27-1501(b) of the Wingo Act enable a foreign corporation to conduct some activities (including collection activities) without being subject to the consequences found in § 4-27-1502.  In other words, under the Wingo Act, a foreign

---

[8]  Ark. Code Ann. § 04-27-1502 is titled the "[c]onsequences of transacting business without authority," and states that:

> (a) A foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority.
> . . .
> (d)(1)(A) A foreign corporation that transacts business in this state without a certificate of authority shall pay a civil penalty to the state for each year and partial year during which it transacts business in this state without a certificate of authority.

Ark. Code Ann. § 4-27-1502.

corporation can bring a cause of action in the Arkansas courts in furtherance of its collection activities, without a certificate of authority and without being subject to monetary penalty. This, however, is the full effect of the Wingo Act's exclusionary provision. While it is true that J.P. Morgan was not required to obtain a certificate of authority in order to collect on its debts in Arkansas under the Wingo Act, it was required to do so if it wanted to employ Arkansas' non-judicial foreclosure process. J.P. Morgan's extension of the Wingo Act exclusions to the Statutory Foreclosure Act is far too broad.

Finally, during the hearing, J.P. Morgan argued that *Omni Holding and Development Corp. v. C.A.G. Investments, Inc.*, 370 Ark. 220, 258 S.W.3d 374 (2007), establishes authority for its position. In *Omni*, a creditor filed a lawsuit against Omni seeking a judgment on its promissory note and claiming that Omni had committed an unlawful detainer of its property. In response, Omni claimed the creditor lacked standing because it did not have a certificate of authority. The Arkansas Supreme Court held that the creditor did not need a certificate of authority because its actions fell within the Wingo Act exclusion for collection activities. *See Omni Holding and Development Corp.*, 370 Ark. at 226. Consistent with the Court's determination above, the holding in *Omni* only stands for the proposition that a creditor can file a lawsuit in furtherance of collection activities without a certificate of authority. *Id.* ("Thus, C.A.G. was not 'transacting business' in Arkansas and its failure to obtain a certificate of authority did not prevent C.A.G. ***from filing suit in the state***.") (emphasis added). Under the Wingo Act exclusions, J.P. Morgan was allowed to foreclose on these properties through a judicial foreclosure action in the state court, but it was

14

prohibited from using the state's non-judicial foreclosure process. *Omni* does not support J.P. Morgan's argument.

Therefore, the Court finds that no conflict exists between the Wingo Act and the Statutory Foreclosure Act, and to the extent that any conflict is present the more precise provision of the Statutory Foreclosure Act controls.

### *The National Banking Act*

Finally, J.P. Morgan maintains that federal legislation preempts the requirement in Arkansas' Statutory Foreclosure Act that a bank be authorized to do business in Arkansas before it employs the state's non-judicial foreclosure process.

The federal law presented as having preemptive authority in this case is the National Banking Act ("**NBA**"). A brief review of the text, history, and purpose of the NBA is essential to the task of analyzing its preemptive effect. In 1864, Congress placed into law an act that established a national banking system. An Act to Provide a National Currency Secured by a Pledge of United States Bonds, and to Provide for the Circulation and Redemption Thereof, ch. 106, 13 Stat. 99 (1864) (codified as amended at 12 U.S.C. §§ 1 *et seq.*). Today, that system of laws remains largely intact, and has been renamed the National Banking Act. 12 U.S.C. § 38. *See also Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10-11, 127 S.Ct. 1559, 1566, 167 L.Ed.2d 389 (2007). The purpose of the national banking act is to prevent the "[d]iverse and duplicative superintendence of national banks" by the differing laws of the individual states. *Watters*, 550 U.S. at 13-14. *See also Easton v. State of Iowa*, 188 U.S. 220, 229, 23 S.Ct. 288, 290, 47 L.Ed. 452 (1903) (describing the goal of the NBA

15

as "the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the states.").

Preemption occurs under Article VI of the Constitution, the Supremacy Clause, which provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. A determination of whether a state law is preempted by federal law "start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). A determination as to the congressional purpose of a law is the "ultimate touchstone" of any preemption analysis. *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963); *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 30, 116 S.Ct. 1103, 1107 (1996) ("This question is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the Supremacy Clause requires courts to follow federal, not state, law.").

Congressional intent to preempt a state law is typically derived from the language, structure, or purpose of the federal statute. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Accordingly, preemption is classified into three different categories: express preemption, field preemption, and conflict preemption. *See*

16

*Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n*, 461 U.S. 190, 203-04, 103 S.Ct. 1713, 1721-22, 75 L.Ed.2d 752 (1983). *See also Altria Group, Inc. v. Good*, 555 U.S. 70, 76, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008).

Express preemption exists where Congress's intent to preempt the state law is clearly stated in the language of the federal statute. *See Pacific Gas & Elec. Co.*, 461 U.S. at 203. However, more often than not, Congress does not make such an explicit manifestation of its intent. *See Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 33, 127 S.Ct. 1559, 1579, 167 L.Ed.2d 389 (2007) (Stevens, J., dissenting). In the absence of such an explicit expression, the courts must determine whether the statutory provision implies a preemptive intent by evaluating the structure and purpose of the statute. *See Barnett Bank of Marion County, N.A., v. Nelson,* 517 U.S. 25, 32, 116 S.Ct. 1103, 1108, 134 L.Ed.2d 237 (1996). These implied forms of preemption are referred to as field preemption and conflict preemption, respectively. *Id.* Field preemption exists if the structure of the statute represents a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. at 230. Alternatively, conflict preemption exists where the purpose of the federal law conflicts with the state law. *See Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128-29, 68 L.Ed.2d 576 (1981) ("It is basic to this constitutional command that all conflicting state provisions be without effect."). Conflict preemption arises under two different scenarios. The first scenario, referred to as physical impossibility preemption, is when it is physically impossible to comply with both the federal law and the state law at the same time. *See*

17

*Pacific Gas & Elec. Co.,* 461 U.S. at 204; *In re Bate*, 2011 WL 2473493, at *2-4 (Bankr. M.D. Fla. June 22, 2011). The second scenario, referred to as obstacle preemption, is when the "state law stands as an obstacle to achieving the objectives of Congress." *Id.*

In these cases, there is no real question that express preemption does not apply. There is no specific provision in the NBA clearly stating a congressional intent to preempt state laws regarding non-judicial foreclosure, or moreover, state laws requiring a person or entity to be authorized to do business in the state before employing the non-judicial foreclosure process. Thus, the NBA does not expressly preempt the authorized-to-do-business requirement of the Statutory Foreclosure Act.

Field preemption is also inapplicable. The Supreme Court has specifically identified the activities of the "acquisition and transfer of property," and the "right to collect their debts," as areas where banks are generally subject to state law. *Watters*, 550 U.S. at 11; *McClellan*, 164 U.S. at 357. Additionally, regulations promulgated by the Office of the Comptroller of Currency (the "**OCC**") save certain areas of state law from general preemption by the NBA.[9] *See Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 282 (6th Cir. 2009). Those regulations state that state laws on the subjects of the "rights to collect debts[,]" and the "[a]cquisition and transfer of property[,]" are not inconsistent with the national bank's real estate lending powers, provided those state laws only "incidentally

---

[9] In many cases, the OCC regulatory interpretations are entitled to substantial deference, commonly known as *Chevron* deference. *Investment Co. Institute v. Camp,* 401 U.S. 617, 626-27, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) ("It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute.").

affect" the bank's exercise of its powers.  12 C.F.R. §§ 34.4, 7.4007(c), 7.4008(e).  The collection of debts and transfers of property are the specific types of activities dealt with by the state law in question, the Statutory Foreclosure Act.  Thus, the Court is not persuaded that the NBA's occupation of these areas is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  As a result, field preemption does not apply.

As previously mentioned, conflict preemption is found in two different forms: physical impossibility preemption and obstacle preemption.  The first of these types, physical impossibility preemption, is not present in this case.  It is not "physically impossible" for J.P. Morgan to comply with the requirements of both the NBA and the authorized-to-do-business requirement of the Statutory Foreclosure Act.  Such a scenario might exist if, for example, a provision of the NBA prohibited national banks from being certified to transact business within a state.  It might then be physically impossible for J.P. Morgan to comply with both the NBA's requirement and the authorized-to-do-business requirement of the Statutory Foreclosure Act.  However, no such provision is found in the NBA, and as a result, physical impossibility preemption does not apply.

The remaining determination is whether obstacle preemption applies.  This determination turns on whether the authorized-to-do-business requirement of the Statutory Foreclosure Act "stands as an obstacle to achieving the objectives of Congress." *Pacific Gas & Elec. Co.,* 461 U.S. at 204.  A state law stands as an obstacle to a federal law when it significantly interferes with the objectives of that federal law.  *Barnett*, 517 U.S. at 33;

19

*Watters*, 550 U.S. at 12. As previously stated, Congress's objective in creating the NBA was to prevent the "[d]iverse and duplicative superintendence of national banks" by the differing laws of the individual states. In order to accomplish that objective, the NBA vests national banks with certain enumerated powers. 12 U.S.C. § 24.[10] Those enumerated provisions provide national banks with "all such incidental powers as shall be necessary to carry on the business of banking . . . ." 12 U.S.C. § 24 (Seventh). Additionally, Congress has given national banks the authority to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interest in real estate . . . ." 12 U.S.C. § 371. *See also Watters*, 550 U.S. at 18 (stating that mortgage lending is one aspect of the "business of banking").

The question is whether the burden of the requirement that a bank be authorized to do business in Arkansas before using the non-judicial foreclosure process significantly impairs the bank's ability to conduct its business of banking, which includes its rights to hold and enforce mortgage liens. The Court finds that it does not. Obviously, the Statutory Foreclosure Act requirement places some measure of burden on a national bank holding a mortgage on property in Arkansas if it wants to foreclose on that property through the state's non-judicial foreclosure process. However, a bank's failure (or refusal) to comply with the Statutory Foreclosure Act requirement leaves the bank with the option of foreclosing on a property through the state's judicial process. On that point, the Statutory Foreclosure Act

---

[10] J.P. Morgan did not direct the Court to any specific provision of the NBA to support its argument that the authorized-to-do-business requirement creates an obstacle to achieving Congress's objectives. Nonetheless, the Court's review of the NBA has identified several powers granted to national banks that extend to such an argument.

specifically states that "[t]he procedures set forth in this chapter for the foreclosure of a mortgage or deed of trust shall not impair or otherwise affect the right to bring a judicial action to foreclose a mortgage or deed of trust." Ark. Code Ann. § 18-50-116(a).  While this alternative method of collection (judicial foreclosure) may not be as efficient as the non-judicial foreclosure process, the Court finds that it does not significantly impair the bank's ability to collect on its debt.[11]

Moreover, the process of judicial foreclosure is available in all states, while only approximately 60 percent of the states allow non-judicial foreclosures.  *See* Grant S. Nelson, *Reforming Foreclosure: The Uniform Nonjudicial Foreclosure Act*, 53 Duke L.J. 1399, 1403 (2004).[12]  J.P. Morgan's contention that the provisions of the NBA are significantly impaired by the authorized-to-do-business requirement is undermined by the fact that only slightly more than half of the states authorize such a procedure at all.  The Court finds that the powers conferred to J.P. Morgan under the NBA are not significantly impaired by the Statutory Foreclosure Act's requirement that J.P. Morgan be authorized to do business in Arkansas, and as a result, conflict preemption does not apply.

For the foregoing reasons, the Court finds that the Statutory Foreclosure Act's requirement that a person or entity be authorized to do business in the state is not preempted by the NBA.  As a result, the Court finds that J.P. Morgan was not in compliance with the

---

[11]  The Court also notes that all a national bank must do in order to meet the requirements of Ark. Code Ann. § 18-50-117 is become authorized to do business in the state.

[12]  A list of the types of foreclosure allowed by each state is available at http://www.realtytrac.com/foreclosure-laws/foreclosure-laws-comparisons.asp (last visited Sept. 12, 2011).

Statutory Foreclosure Act, and that the Debtors do not owe, nor must they pay, J.P. Morgan for any fees and costs incurred through the non-judicial foreclosure proceedings conducted against these Debtors.

### *Attorney Fees*

Both parties have asked for an award of attorney fees.  As a general rule, known as the "American rule," the parties to litigation must pay their own attorney fees.  *In re Hunter*, 203 B.R. 150, 151 (Bankr. W.D. Ark. 1996).  However, certain exceptions to this rule exist, one of which is found in Ark. Code Ann. § 16-22-308, which states,

> In any civil action to recover on an open account, statement of account, account stated, promissory note, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.

Ark. Code Ann. § 16-22-308.  Under Arkansas law, an award of prevailing party attorney fees under this statute are permissive and discretionary.  *In re Cameron*, No. 4:10-bk-14987, 2011 WL 1979503, at *6 (Bankr. E.D. Ark. May 17, 2011).

This action was brought by the Debtors to determine whether they owed the foreclosure fees and costs incurred by J.P. Morgan in conducting non-judicial foreclosure proceedings on its promissory notes.  The Debtors are the prevailing party in these matters, and as such, the Court awards the Debtors a reasonable amount for their attorney fees. Counsel for the Debtors shall submit a separate application for those fees to the Court, as further ordered below.

22

## CONCLUSION

For the foregoing reasons, the Court concludes that J.P. Morgan was not in compliance with the authorized-to-do-business requirement of the Statutory Foreclosure Act when it conducted the foreclosures against these Debtors.  Additionally, the Court has determined that J.P. Morgan's failure to comply with Ark. Code Ann. § 18-50-117 was not cured by empowering an attorney-in-fact under Ark. Code Ann. § 18-50-102, was not superceded by the Wingo Act, and was not preempted by the National Banking Act.  As a result, the foreclosure fees and costs incurred by Chase and J.P. Morgan are not owed by the Debtors, and need not be included in the Debtors' repayment plans in order for those plans to be confirmed.

Further, the Court has determined that the Debtors should be awarded their attorney fees incurred in pursuing these actions.

Therefore, it is hereby

**ORDERED** that the Objections to Confirmation are **OVERRULED**; it is further,

**ORDERED** that the Defendant shall pay the reasonable attorney fees incurred by the Debtors in pursuing these actions.  The Court will determine the amount of this award on further application by Debtors' Counsel, which shall include an itemization of the attorney fees incurred in these actions.  This application must be filed with the Court within 14 days of the entry of this Order, and shall be served on Counsel for J.P. Morgan.  J.P. Morgan shall have 14 days from the date that fee application is filed with the Court in which to file a response, should it wish to do so.

23

**IT IS SO ORDERED.**

Audrey R. Evans
United States Bankruptcy Judge
Dated:   09/28/2011

cc:     Debtors
        Kathy Kruz, attorney for Debtor
        Joel Hargis, attorney for Debtors
        Kimberly Burnette, attorney for Creditor
        Mark T. McCarty, Trustee
        U.S. Trustee

24